AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with the email account
taehkm1@gmail.com that is controlled by Google, Inc

)
)
)
)
)
)

Case No. 16-84M

REDACTED

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated fully herein.

located in the _____Northern_____ District of _____California (ECPA)_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated fully herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC ss. 215, 317, 1001, 1014, 1344, and 2 | Receipt of Gift for Procuring Loan; Conspiracy; False Statement to Executive Branch; False Statement Relating to a Loan; Bank Fraud. |

The application is based on these facts:
See attached Affidavit, incorporated fully herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent David Bole, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____04/13/2016_____

_____
*Judge's signature*

City and state: _____Wilmington, DE_____

Hon. Mary Pat Thynge, Chief U.S. Magistrate Judge
*Printed name and title*

2016 APR 13 AM 11:50 CLERK U.S. DISTRICT COURT DISTRICT OF DELAWARE FILED

2016 NOV 14 AM 10:08 CLERK U.S. DISTRICT COURT DISTRICT OF DELAWARE FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH taehkm1@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY Google, Inc., 1600 Amphitheatre Parkway, Mountain View, CA 94043 | Case No. 16- $84M$ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANT

I, David F. Bole, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain account, taehkm1@gmail.com (the "TARGET

ACCOUNT"), that is stored at premises controlled by Google, Inc., an email provider

headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The

information to be searched is described in the following paragraphs and in Attachment A. This

affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a),

2703(b)(1)(A), and 2703(c)(1)(A), and Rule 41 of the Federal Rules of Criminal Procedure, to

require Google, Inc. to disclose to the government copies of the information (including the

content of communications) further described in Section I of Attachment B. Upon receipt of the

information described in Section I of Attachment B, government-authorized persons will review

that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been so employed since July of 1998. As a Special Agent with the FBI, I am authorized to

investigate violations of the laws of the United States and to execute search warrants issued

1

pursuant to Rule 41 of the Federal Rules of Criminal Procedure. I am currently assigned to the criminal investigative squad of the FBI's Dover, Delaware Resident Agency, Baltimore Division. I have been trained in investigating white collar crime matters and have experience in cases relating to various types of fraud and other criminal activity, including health care fraud, bank fraud, mortgage fraud, complex financial crimes, election fraud and public corruption. In my experience as a Special Agent with the FBI, I have prepared, assisted and/or participated in the execution of numerous search warrants conducted at physical locations and of email accounts. In my training and experience, I have become familiar with the basics of email communications and how such communications are used in day to day business activities.

3.      All information contained in this affidavit is either personally known to your Affiant or has been related to your Affiant by other law enforcement agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that TAE H. KIM ("KIM") and DR. ZAHID ASLAM ("ASLAM") violated 18 U.S.C §§ 215(a)(2)(1) (Receipt of Gifts for Procuring Loans), 1001 (submission of a false statement to an Executive Branch agency), 1014 (false statement in connection with a loan application), 1344 (Bank Fraud), 2 (aiding and abetting), and 317 (conspiracy to commit the listed offenses). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities or fruits of these crimes further described in Attachment B.

2

## II. JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated" as defined by 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703 (g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## III. STATUTES AT ISSUE

6. The Affidavit sets forth probable cause that KIM and/or ASLAM violated the following statutes:

A.      Title 18, United States Code, Sections 215(a)(1) and (2) prohibits any person from corruptly giving, offering, or promising anything of value with the intent to influence an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution; or for such a bank employee to corruptly solicit or demand or to corruptly accept or agree to accept anything of value (including a loan), intending to be influenced or rewarded in connection with any business or transaction of such institution.

B.      Title 18, United States Code, Section 1001 provides that it is a federal crime to make a materially false, fictitious, or fraudulent statement or representation, or to make or use any false writing or document with respect to any matter within the jurisdiction of the executive branch of the Government of the United States.

C.      Title 18, United States Code, Section 1014 provides that it is a federal crime to knowingly make any false statement or report for the purpose of influencing in any way

3

the action of any institution the accounts of which are insured by the Federal Deposit Insurance Corporation.

D.      Title 18, United States Code, Section 1344 provides that it is a federal crime to knowingly execute a scheme or artifice to defraud a financial institution or to obtain any of the moneys under the custody of a financial institution by means of fraudulent pretenses, representations, or promises.

E.      Title 18, United States Code, Section 371 provides that it is a federal crime for two or more persons to conspire to commit any offense against the United States or to defraud the United States or any agency thereof in any manner or for any purpose.

## IV. PROBABLE CAUSE TO SEARCH THE TARGET ACCOUNT

### A. Background



8.      As set forth in further detail below, your Affiant learned during the investigation that, ████████████████ ASLAM has also been involved in a longstanding loan fraud scheme, in which he utilizes third-party nominee borrowers to obtain loan proceeds (primarily for health care practices) that are actually for ASLAM's benefit. As part of this scheme, the third-party borrowers transfer loan proceeds to accounts under ASLAM's

4

direction and control. In return, ASLAM pays the third-party nominees certain fees (up-front or on a monthly basis); the nominees gain the ability to expense interest payments and to recognize the depreciation of assets; and the nominees have the potential to recognize capital gains upon the sale of the assets.

9.      Moreover, as set forth in further detail below, there is probable cause that ASLAM and the nominee borrowers/guarantors have submitted additional false statements in connection with commercial loan requests, including concealing personal liabilities, misrepresenting the amount of collateral securing loans or the amount of equity invested into businesses, and diverting loan proceeds from their stated purposes in commercial loan agreements.

10.     Furthermore, there is probable cause that KIM is aware of, and complicit in, ASLAM's fraudulent loan schemes. KIM has served as ASLAM's longtime relationship manager at two different banks, Citibank and WSFS. As set forth more fully below, ASLAM has sent loan documents and supporting items to KIM relating to loans for the nominee borrowers, and KIM has dealt directly with ASLAM as to the origination and/or administration of the nominee loans.

11.     In addition, ASLAM and KIM have been involved in a personal business relationship dating back to at least June 2010. Throughout the course of the ASLAM/KIM relationship, KIM has partnered with ASLAM in multiple business ventures, which he failed to disclose to his supervisors at Citibank and WSFS, respectively. As detailed further below, since March 2012, ASLAM has made at least two large payments to KIM totaling $99,510.00. Also, in November 2014, ALSAM transferred a 2009 BMW to KIM, for which there is no evidence that KIM provided payment.

5

12. ███████████████████████████████████

███ numerous emails were discovered that corroborated the business relationship between

ASLAM and KIM, as well as the ongoing communication between ASLAM and KIM via email.

**B. The KIM/ASLAM Lending Relationship at Citibank**

13. In or around August 2007, KIM was hired as a Relationship Manager at Citibank

N.A. ("Citibank"). Citibank, which is headquartered in New York, is a "financial institution" as

defined under 18 U.S.C. § 20 and whose deposits are insured by the Federal Deposit Insurance

Corporation. KIM worked out of Citibank's Plymouth Meeting, Pennsylvania branch from in or

around the date of his hire until in or around April 2013.

14. As a condition of his hire, KIM signed a form on or about September 10, 2007,

acknowledging that he had reviewed and understood his obligations under Citibank's Code of

Conduct, and that he would comply with the Code of Conduct. Relevant to this investigation,

the Code of Conduct prohibited employees from accepting gifts or the conveyance of anything of

value (including a loan) from a client or prospective client; and required employees to notify

their supervisors of any business relationship or proposed business relationship with a client.

15. During that time period, ASLAM was one of KIM's lending clients. A review of

records obtained from Citibank reveal that KIM originated several loans for ASLAM and other

nominees, some of which ultimately defaulted.

16. The listed borrower/guarantor for at least one loan originated by KIM at Citibank

– Cecil Surgery Center, LLC ("Cecil Surgery") – was ████████████. In addition,

███████ acted as the nominee owner of Gynecologic Oncology Services, LLC ("GOS"), a

medical practice in Allentown, Pennsylvania, that was related to ASLAM, █████████

██████████, KIM and █████████████████ among others.

1.    **The GOS Business Relationship**

17.    During your Affiant's review of ASLAM's email account, I located an email dated July 27, 2011, from ASLAM to KIM at the TARGET ACCOUNT. An attachment to that email contained a term sheet for the GOS transaction. According to the term sheet, the parties to the GOS agreement were ASLAM, ████████████████, and their related entities. The transaction contemplated the formation of three separate entities:

A.    GOS, which would be owned and managed by ████████, and which would be the entity through which medical services would be performed and billed;

B.    The Infusion Center of Allentown ("ICA"), which would be owned by ████████████████████████ and another doctor, and which would (i) provide management services (including inventory and supply management) to GOS; (ii) sublease the actual office space to GOS; and (iii) enter into a lease with another entity, Newco, for the services of the nursing and administrative staff; and

C.    Newco, which would actually employ the nursing staff and certain administrative staff.

18.    Despite the fact that ████████ was listed as one of the owners of ICA, your Affiant's review of emails indicated that KIM was personally involved in ordering medication and supplies for ASLAM's medical businesses. For example, on or about December 14, 2012, ASLAM emailed KIM at the TARGET ACCOUNT with a list of medications, stating, "need these things asap even if you have to go to Florida." KIM thereafter sent an email from the TARGET ACCOUNT asking if the items could be delivered, and, upon learning that certain items could be, directed that the items be delivered to the address of ASLAM's medical practice: 300 E. Pulaski Hwy., Elkton, Maryland.

19.     In addition, payments from GOS were made to KIM's personal bank account, as well as to a separate business bank account opened by KIM:

A.     A review of bank records demonstrates there were five payments totaling $29,275 from the GOS into KIM's personal bank account during the time period of June 2013 through May 2015, including a check dated June 12, 2013, in the amount of $19,275.07, for which the memo line listed "payment to shareholder."

B.     On or about May 22, 2012, KIM opened a separate business bank account at Wells Fargo in the name "Gynecological Oncology Services, LLC." The account documents listed KIM as the sole owner and provided the address of his personal residence in Wayne, Pennsylvania as the address for the business. Your Affiant identified numerous electronic fund transfers into the account from insurance companies during the period of operation. The primary withdrawals consisted of payments to a medical supply company.

20.     In addition, an email, which KIM sent from the TARGET ACCOUNT to ASLAM on March 5, 2013, further illustrates KIM's involvement in GOS. In the email, KIM asked ASLAM, "Can you get your wife to sign the verification and email back to me? The creditors are coming after ▮▮▮▮ and we need to show them that he has nothing to with GOS. I will also need the original." In the last sentence in the aforementioned email KIM wrote the following, "I should receive the commitment letter for Tri State soon." The "Tri-State" reference by KIM refers to a loan that KIM attempted to obtain for ASLAM at Citibank, under a nominee borrower ▮▮▮▮▮▮▮ before he was forced to leave his employment at Citibank. As set forth in greater detail below, in July 2013, KIM obtained the Tri-State loan for ASLAM, in

8

█████████ name, in his new role as a commercial lender at WSFS Bank ("WSFS"). (The Tri-State loan is more fully explained in paragraphs 40-46, *infra*.)

21.     On or about January 1, 2012, or only five months into his ownership of GOS, █████ withdrew from the company and transferred all of his interests in GOS to █████ ████████████████████. The initial capital contribution from █████ listed in the agreement was $1.00.

## 2.     The Cecil Surgery Center Loan

22.     Less than two weeks later, on or about January 12, 2012, █████ submitted an application through KIM via Citibank to the Small Business Administration ("SBA") for a loan in the amount of $1.72 million (later increased to $1.76 million). The listed borrower for the loan was Cecil Surgery Center, LLC ("CSC"). In the Loan Request Form, CSC was listed as the "Applicant Company," and █████ was listed as the "Management/Ownership of Applicant Company." █████ represented that he owned 100% of CSC.

23.     Despite █████ representation that he controlled the CSC, there is evidence that CSC was, in fact, controlled by ASLAM. For example, ASLAM applied for the EIN tax number for CSC, which was sent to ASLAM's home address. In addition, ASLAM had signature authority over each of the known checking accounts associated with the CSC (at Citibank and WSFS). Moreover, the Citibank and WSFS statements for the CSC were not mailed to █████ address, but rather to an address owned by ASLAM and which is the primary residence of █████████████████.

24.     In addition, under the terms of the SBA loan, the CSC was required to establish a cash collateral account in the amount of $350,000. There is no indication, however, that █████

9

provided any of the funds for the cash collateral account. Rather, the equity in the collateral account was sourced by ASLAM, through AMNA Medical Care.

25.    Finally, all SBA loans require that there be no conflict of interest between the Lender or any of its Associates and the Borrower. A conflict of interest exists, *inter alia*, when the "Lender or Associate or close relative of lender has a significant direct or indirect financial or other interest in applicant, or has had such an interest within 6 months prior to the date of the application." Here, at the time that the CSC applied for the SBA loan, KIM had an ongoing business relationship through the GOS with ASLAM and (at least within the preceding six months) with ▮▮▮▮. In addition, as set forth below in greater detail in paragraphs 27-29, KIM received a $60,000 payment/loan from ASLAM in February 2012 (during the period of the SBA approval process) through a check made payable from the 300 E. Pulaski LLC account at Northwest Bank – the same account from which the $350,000 cash collateral account for the CSC was funded.

26.    Moreover, your affiant located an email dated December 14, 2012, entitled "More medications needed for Cecil Surgery Center," in which one of ASLAM's assistants wrote to KIM at the TARGET ACCOUNT: "My name is ▮▮▮▮, I am assisting Dr. Azlam (sic) in the opening of the surgery center. Dr. Azlam sent you a list earlier today of medications that we are in need of. He has asked me to add some more medications to the list." The email demonstrates that KIM was in business providing medical supplies to the very company for whom he processed the SBA funds.

### 3.    The $60,000 Check to KIM

27.    As referenced in the paragraph 25, on February 28, 2012, KIM received a check in the amount of $60,000.00 from 300 E. Pulaski LLC, an entity controlled by ASLAM and ██████████████████████. The address of 300 East Pulaski Hwy. contains the Alpha Medical Center ("AMC"), a multi-specialty medical practice facility owned by ASLAM. The AMC, which is housed in a former Wal-Mart store in Elkton includes several different medical practices, including the CSC (referenced above) and Tri-State MRI & Imaging (referenced below). In or around February 2012, the entity 300 E. Pulaski LLC received $10.2 million in financing from Northwest Savings Bank ("NWSB") to refinance the existing loan and to complete the construction of the AMC.

28.    On or about February 29, 2012, KIM deposited the $60,000 check into his personal checking account at Wells Fargo Bank, and the check cleared on or about March 3, 2012. The listed address for KIM's personal account was his personal address in Wayne, Pennsylvania.

29.    During this time period, KIM was still employed by Citibank and was the Relationship Manager for ASLAM's loans, as well as for loans that KIM originated for ██████
██████

### 4.    Citibank Terminates KIM

30.    On February 8, 2016, your Affiant contacted and interviewed KIM's former supervisor ██████████████ at Citibank, based on an internal complaint ██████ made in late March 2013 against KIM. ██████ explained that he received a complaint about KIM from one of his clients because the client was upset that KIM had attempted to recruit him into a business deal with ASLAM.   On March 15, 2013, soon after the complaint from the client, KIM

11

responded into the Citibank Branch in Berwyn, PA, ████████, and closed the GOS account.
After KIM closed the account, a preauthorized debit ($19,821.82) processed through the account
and caused it to be over-drafted.

31.    On March 22, 2013, ████ was contacted by ████████████████

████████████, and told that KIM had a check from the GOS client to cover the deficit and
would give it to ████ when they met.

32.    On March 26, 2013, ████ documented in an email that he later questioned KIM
regarding why he had deposited a check on behalf of a client. ████ noted that KIM explained
that the client was GOS, and that one of the principals in GOS was ████ – who also was a
principal in the CSC, as well as well as on another ASLAM-related loan, Chesapeake Women's
Care, LLC ("Chesapeake"). KIM further acknowledged to ████ that ████ worked at the
GOS, in an unknown capacity, and was a "non-owner signer" on the account.

33.    Your Affiant further learned from ████ that he reported the incident because he
found it inappropriate that ████ was a signer on the account for one of KIM's clients and
also because KIM never disclosed ████ employment with his client. According to ████,
KIM was going to be terminated from his employment at Citibank as a result of the
aforementioned situation, but resigned before that occurred.

34.    Your Affiant learned from Citibank officials that Citibank has suffered losses
with respect to at least three loans associated with ASLAM: (1) $377,363.7 related to the CSC
loan; (2) $440,043.82 for a loan related to Chesapeake; and $44,359.34 for a line of credit
associated with Chesapeake.

### C.    The KIM/ASLAM Lending Relationship at WSFS

35.    In May 2013, KIM was hired as a commercial Loan Officer at WSFS. WSFS, which is headquartered in Wilmington, DE, is a "financial institution" as defined under 18 U.S.C. § 20 and whose deposits are insured by the Federal Deposit Insurance Corporation. WSFS hired KIM to work at its branch in Plymouth Meeting, Pennsylvania.

36.    In advance of his hire, KIM solicited ASLAM via the TARGET ACCOUNT to request that ▮▮▮▮▮ the ▮▮▮▮▮▮▮▮▮▮ (with whom ASLAM also had an extensive financial relationship), write a letter of recommendation on his behalf. On or about April 12, 2013, ASLAM emailed ▮▮▮▮ forwarding a request from KIM for ▮▮▮▮ to write him a letter of recommendation. KIM contained bullet points of what he wanted ▮▮▮▮ to write, including that: (1) ▮▮▮▮▮ had offered him a job as a loan officer and that his hire at another institution "will be a great loss" to ▮▮▮▮▮; (2) that ▮▮▮▮▮ had tried to recruit KIM over the past two years; and (3) that ▮▮▮▮ had been "impressed by how loyal my customers were to me for my service and commitment to them." KIM concluded, "I need this asap. Can you make sure that there is no way that WSFS can find out if I applied with them or not." In his email to ▮▮▮▮, ASLAM wrote, in part: "Please see the email from Tae. See if we can help him in getting his [j]ob at WSF [sic]." In response, ▮▮▮▮ drafted a letter of recommendation (dated April 27, 2013) for KIM, inserting the information that he had requested her to include.

#### 1.    The $39,510 check to KIM

37.    Shortly after KIM joined WSFS, ASLAM opened a new checking account for AMNA Medical Center, LLC, at WSFS. Thereafter, an initial deposit in the amount of $825,000 was made into the AMNA account. The AMNA account remains in existence at WSFS.

38.     The first check written from the AMNA account at WSFS was a check in the amount of $39,510 made payable to "Cash." As set forth in paragraph 72 below, the proceeds from the $39,510 check went to KIM and were recorded in ASLAM's accounting records as an "expense."

39.     Less than one week later, on or about May 23, 2013, KIM approved a $900,000 loan for ASLAM at WSFS to purchase the Doc-In-A-Box Walk-in Medical Center at 379 Walmart Drive, Camden, Delaware. The loan was funded on June 3, 2013.

**2.     The Tri-State MRI nominee loan to ███████**

40.     On or about August 8, 2013, KIM originated a $2,183,000 loan for ███████ ███████ for Tri-State MRI & Imaging ("Tri-State"), at the AMC in Elkton. Your Affiant's investigation has revealed that ███████ is the ███████████████████, who has an ongoing, separate business relationship with ASLAM relating to the investment in hotel ventures. In addition, the investigation has revealed that ███████ has acted as a nominee borrower for Aslam and ███████ with respect to other real estate ventures on several occasions in the past.

41.     The stated purpose of the Tri-State loan was "for the fit out of a multi-modality MRI imaging Center" in the AMC. In the Credit Memorandum that KIM submitted to the WSFS loan committee in connection with the funding request, he stated that ASLAM sought out ███████ to set up Tri-State in order to avoid violating a federal law that "prohibits physician referrals of designated health services including radiology scans & ultrasound services for patients if the physician has a financial relationship with that entity." According to the Memo, the total amount of costs to construct the facility would be $2,729,600 – including approximately $2,251,500 in construction costs and $478,000 in soft costs associated with the fit out of the

AMC. The Memo further stated that ▮▮▮▮▮ placed $545,920 in equity into the project; and that the $2,183,680 loan proceeds would cover the remaining balance. KIM represented in the Memo that construction at the AMC was "nearly 70-80%" complete, and that, "Until today, the construction costs have been primarily financed by the contractor's funds and the borrower's injected cash."

42.     In addition, the listed contractor for the Tri-State loan was Nationwide Contractors, LLC ("Nationwide"), an ASLAM-related entity. ASLAM and ▮▮▮▮▮▮▮▮ ▮▮▮▮ are listed as the managing members of Nationwide on a checking account for Nationwide housed at NWSB. The physical address associated for Nationwide is the same physical location as the AMC and Tri-State.

43.     Your Affiant reviewed deposits and other transfers into Nationwide, AMNA, and other accounts known to be controlled by ASLAM during the time period January 1, 2013, through August 1, 2013. There are no recorded deposits made by ▮▮▮▮▮▮ into any of the ASLAM accounts, in particular Nationwide. The only relevant deposit during the time period was a $37,500 deposit into the AMNA account at NWSB from ▮▮▮▮▮▮▮▮▮ s parents that was labeled "Loan to ▮▮▮." There are no other deposits indicative of a cash injection by ▮▮▮▮▮▮ to pay for construction costs.

44.     Furthermore, a review of ASLAM's WSFS bank accounts showed that approximately $1 million in proceeds from the Tri-State Loan were funneled through multiple accounts, including through two accounts under the control of ASLAM and ▮▮▮ at NWSB and then back to another account (AMNA Medical Center) under their control at WSFS. (As set forth in paragraph 48 below, the $1 million deposit into the AMNA WSFS account was used, in part, to justify a $1.8 million loan to ASLAM for MedTix.) On or about July 30, 2013, $1.8

15

million was transferred from the AMNA WSFS account to Terrain Title & Escrow Co. -- $1 million of which appears to consist of proceeds of the Tri-State loan. On August 1, 2013, a check in the amount of $1.8 million was written from the Terrain Title & Escrow account made payable to "Cash."

45.    In addition to the approximately $1 million in proceeds diverted through multiple accounts, there is also evidence that $75,000 from the loan was transferred through a Tri-State account at WSFS to █████████ -- █████████████████ 's brother.

46.    There is further evidence that KIM was aware that the█████████ loan was a nominee loan. On or about March 20, 2013, KIM emailed ASLAM from the TARGET ACCOUNT and attached (1) a business plan for Tri-State; (2) a business credit application for █████████ for Citibank; and (3) a request for tax transcripts, which had been signed by █████████ At the time of the email, KIM was still working for Citibank. He did not copy █████████ on the email, but rather communicated directly with ASLAM regarding Tri-State. Within the week, KIM resigned from Citibank. As set forth above, he later submitted the Tri-State loan to WSFS for approval.

### 3.    The loan to purchase MedTix

47.    On August 8, 2013, Kim originated a $2,000,000 loan for ASLAM to purchase the MedTix Home Medical Equipment & Respiratory Care Co. ("MedTix"), headquartered in Lewes, DE. The stated purpose of the loan was a $1,800,000 business term loan for financing 90% of the purchase price of outstanding membership interests in MedTix, LLC. In addition, ASLAM received a new $200,000 working capital line of credit to refinance the borrower's existing $200,000 line of credit with Community Bank. The borrowing entity was MedTix, LLC

16

and ASLAM and Med Solutions, LLC were listed as the guarantors. ( [ ] was listed with the Delaware Secretary of State as being the registered agent for Med Solutions, LLC.)

48. In the Credit Memorandum associated with the MedTix loan, KIM wrote that ASLAM recently wired $1,000,000 to WSFS to increase his deposits to $2,000,000. KIM further wrote that ASLAM has been a "fruitful" source of referrals and recently referred [ ]

[ ] to WSFS to set-up an MRI and Imaging Center in Elkton, MD. A review of the Tri-State Loan documents and ASLAM's accounts showed that the $1,000,000 deposit referenced by KIM in his Credit Memorandum to justify the MedTix loan was actually funded with proceeds from the Tri-State loan – which was not disclosed to the WSFS loan committee. Neither did the Credit Memorandum disclose the additional liabilities incurred by ASLAM in connection with the Tri-State loan.

49. The Credit Memorandum contemplated that the loan would be secured, in part, by (1) an initial cash injection by ASLAM to cover approximately 10% of the purchase price (or, approximately $200,000); and (2) two cash collateral accounts ($300,000 and $200,000), totaling $500,000. The memorandum submitted to KIM to the WSFS loan committee indicated that the overall loan-to-cost ratio of the loan would decrease to 68% when "considering the initial cash injection plus the cash collateral."

50. Despite the representation that the MedTix loan would be secured by two separate cash collateral accounts, which would decrease the loan-to-cost ratio, in actuality proceeds of the MedTix loan itself were used to set up the cash collateral account – which had the effect of not reducing the loan-to-cost ratio and, in effect, increasing the risk to WSFS of entering into the transaction.

17

51.     WSFS funded the loan on or about August 7, 2013. On that date, the $1.8 million in loan proceeds were broken down into two deposits: (1) a deposit in the amount of $1.3 million into the AMNA Medical Center account at WSFS; and (2) two deposits, in the total amount of $500,000, into a newly-created account named "Med Solutions, LLC." KIM approved the disbursement via his signature on a Loan Disbursement Request.

52.     A large portion of the $1.3 million -- $1.016 million – was thereafter transferred to Terrain Title & Escrow on or about August 8, 2013. Thereafter, a wire in the amount of $966,109 was initiated to Person A, the owner of two Medical Aid Units (not associated with MedTix) in Sussex County, Delaware (referenced in paragraph 54, *infra*).

53.     The $500,000 total deposit into the Med Solutions, LLC account, which was approved by KIM, was utilized to serve as the cash collateral account for the MedTix loan and line of credit, which was not contemplated in the loan request approved by WSFS.

54.     Less than three weeks later, on or about August 26, 2013, KIM originated an additional $1,500,000 loan for ASLAM to purchase two Medical Aid Walk-in Centers in Sussex County. The listed borrower was Fast Care Medical Aid Unit II, LLC, with ASLAM listed as the guarantor.

### 4.     Three separate loans originated by KIM for ASLAM on May 20, 2014.

55.     On May 20, 2014, Kim originated three separate loans for ASLAM under various identities.

A.     The first loan was for $500,000 with the borrower of record being AMNA Medical Care, LLC and the guarantor being ASLAM. The stated purpose for the loan was to refinance the existing seller's note ($500,000) being used to purchase the urgent care center located at ███████████████ Scotch Plains, New Jersey.

18

B.      The second loan on May 20, 2014 was for $700,000. The borrower of record was again AMNA Medical Care, LLC and the guarantor was ASLAM. The stated purpose of the loan was to refinance the existing seller's note ($500,000) being used to purchase an OB/GYN practice in Bel Air, Maryland.

C.      The third loan on May 20, 2014 was for $275,000. The borrower was Fast Care Medical Aid Unit, LLC and the co-borrower was Fast Care Medical Aid Unit II, LLC. The guarantor was ASLAM. The stated purpose of the loan was to upgrade medical technology systems at all of the locations of Dr. Aslam's urgent care centers, dba Got-A-Doc.

56.     An analysis of the $1.475 million in loan proceeds on May 20 suggests that a portion of the funds were not utilized for the stated purposes in the loan agreements. For example, a review of bank and title company documents indicates that ASLAM transferred $400,000 to ▮▮▮▮, the owner of the practice in New Jersey (out of a stated refinance of $500,000) and only $100,000 (out of the stated amount of $500,000) to ▮▮▮▮, the owner of the clinic in Bel Air. In addition, there was no indication that any of the funds relating to the $275,000 loan were used to upgrade medical technology systems. In fact, your affiant interviewed ▮▮▮▮▮ a former ASLAM employee who directed all of ASLAM's Got-a-Doc locations in Delaware. ▮▮▮▮ told your affiant that, during the period of time that she managed the medical centers, there was never an upgrade to the medical equipment or computer systems.

57.     The review of bank and title company documents further revealed that loan proceeds were diverted to other sources, including, but not limited to, approximately $120,000 to ▮▮▮▮▮▮▮▮▮▮▮; $10,000 to ▮▮▮▮▮▮▮; $21,500 to a mobile home park

controlled by ASLAM; $85,000 t; and $5,000 to a bank in Pakistan.

### 5. The BMW

58. In November 2014 and May 2015, your affiant interviewed ▇▇▇▇, who began working as the Director of Aslam's Got-a-Doc locations in April 2013. (▇▇ predated ▇▇ in that capacity.)

59. ▇▇ told your affiant that ASLAM had a close relationship with KIM, and that he was surprised by the speed in which ASLAM received loan approvals from WSFS. ▇▇ specifically recalled discussions between ASLAM and KIM related to the amount of the loan to purchase MedTix, including that KIM was trying to keep the loan amount under a certain dollar figure so the loan did not have to go to the next level of approval within WSFS. ▇▇ further recalled that a vehicle (either Mercedes or BMW) was a part of the MedTix deal but he had no recollection of what happened to the vehicle.

60. During the interview with ▇▇ referenced in paragraph 56, your affiant showed ▇▇ a copy of KIM's Pennsylvania driver's license. ▇▇ immediately started to laugh and stated that ASLAM had obtained a black BMW from the owner of MedTix as part of the purchase. ▇▇ stated that ASLAM "gave" the black BMW to KIM. ▇▇ had no idea what KIM did for a living but recalled that ASLAM always introduced KIM as his business partner. ▇▇ saw KIM driving the BMW on numerous occasions and recalled KIM being around ASLAM on frequent, but random occasions. In addition, KIM accompanied ASLAM during the meetings that he and ▇▇ had with the Clinical Director of Alpha Behavioral Health (ABH) in Dover. ASLAM justified KIM's presence at the aforementioned meetings by claiming that KIM was knowledgeable about behavioral health issues.

61.    On February 27, 2014, SA Greg Mrozek observed a 2009 BMW, 528i, black in color, (the "2009 BMW"), registered in Delaware to MedTix, LLC, and parked in the street in-front of ASLAM's residence in Elkton, Maryland. The prior owner of the BMW was listed as the former owner of MedTix.

62.    On June 9, 2015, your Affiant observed KIM enter the same 2009 BMW described in paragraph 61 in the parking-lot of the WSFS building, 500 Delaware Avenue, Wilmington, DE, and exit the parking garage driving said vehicle. The vehicle described in paragraph 61, now displayed a new Pennsylvania registration tag and was registered to KIM at his residence in Wayne, Pennsylvania. On August 31, 2015, your Affiant observed the aforementioned vehicle parked in the driveway of KIM's residence.

63.    Your Affiant reviewed the transfer documentation for the 2009 BMW from the Pennsylvania Department of Transportation, which stated that ASLAM sold the vehicle to KIM on November 5, 2014 for $11,000. However, a review of KIM's            bank accounts from Bank of America (BOA) and Wells Fargo (five total accounts) did not reveal any payments made to ASLAM or to any of the numerous entities under his control. In addition, there were no cash withdrawals during the relevant time period that were consistent with the vehicle's purchase price. (It should be noted that the aforementioned bank accounts were reviewed from April 2013 to October 2015.)

### C.    The IRS Audit and the Disengagement of Aslam's Accountants

64.    In Fall 2014, the Internal Revenue Service (I.R.S.) conducted an audit of ASLAM and his related entities. During that audit, the I.R.S. revenue agent questioned the $60,000.00 check to KIM. In response, ASLAM, through his representative accountant, indicated that the

21

check constituted a loan. Thereafter, ASLAM, ▮▮▮▮ and KIM created post hoc loan
documents to make the payment appear to be a loan.

     65.    As part of my email review of the ASLAM account, I located a series of emails
between ASLAM, KIM and ▮▮▮▮ as well as ▮▮▮▮▮▮▮▮▮, who was the tax
preparer for ASLAM and his related entities at the time:

- On October 1, 2014, ▮▮▮▮▮▮▮ emailed the following to ASLAM and
  ▮▮▮▮ regarding the $60,000 payment to KIM: "I spoke with [the] IRS Agent,
  today. The IRS would like to treat all the intercompany transfers as capitol
  contributions and withdrawals between the entities in lieu of Intercompany loans.
  I do not see any issues with that, except for the entities you have no ownership in
  (Best Hotel etc.). Do you have the support for the $60,000 payment we spoke of
  during the last IRS visit? Need loan document and proof of repayment."

- On October 2, 2014, ▮▮▮▮ emailed ▮▮▮▮▮▮, a former attorney who
  had been disbarred by the State of Maryland in February 2013, asking, "Can you
  prepare the loan documents?"

- On October 15, 2014, ASLAM emailed KIM the following, "Tae, send info
  asap."

- KIM responded as follows on the same date, listing his address and cell phone.

- On October 15, 2014, ▮▮▮▮ wrote the following to KIM:
  "Attached is the loan documents that Dr. Aslam has asked for you to sign re:
  $60K loan the IRS agent is inquiring about. The documents seem a little overkill
  but these documents are tapered down from the company loan documents we
  already drafted and provided to the IRS for other company transfers. In all

documents 300 E. Pulaski Highway, LLC is the "lender" and you are the

borrower and guarantor. It is a balloon note for $60K at 4%, due 3/1/17. Please

let me know whether you have any questions...."

- KIM wrote the following response back to ████, "Here is the signed paper

work for the note for 60K."

66.     After learning of ASLAM's $60,000.00 payment to KIM, your Affiant contacted

ASLAM's former accountants during the time period in which he was under audit. ASLAM's

tax preparer, ████████████████████████████████, stated that he voluntarily

contacted the I.R.S. and requested a meeting. ████████stated that he met with the I.R.S. and told

the revenue agent that ████disengaged from ASLAM in October 2013 because they believed he

was involved in a ponzi scheme involving Small Business Administration (SBA) loans, through

the use of nominee borrowers, and had made payments to his Loan Officer (KIM) that looked

like bribes/kickback in return for loans. (Note: ████████████became ASLAM's tax preparer

after ████ended their accounting relationship with him).

67.     On January 21, 2016, your Affiant and I.R.S. SA Anthony Lo Piccolo contacted

and interviewed████ and ████████at the IRS Offices in Newark, Delaware. ████works

for ████at ████and was also involved in preparing ASLAM's tax returns. ████and ████

explained that████disengaged from ASLAM because they believed he was involved in a ponzi

scheme involving SBA loans and was using nominee borrowers to further the scheme. ████████

claimed that ASLAM had even tried to recruit him as a nominee borrower, but that he declined.

████████further noted that they are still receiving default notices from various banks at████from

the loans that ASLAM had obtained while████was engaged with him.

68.     Your Affiant further learned from ▮▮▮▮ and ▮▮▮▮ that during the course of

preparing ASLAM's taxes they located two separate payments to KIM that looked like

bribes/kickbacks for loans that KIM had provided to ASLAM. ▮▮▮▮ and ▮▮▮▮ were then

shown a Pennsylvania Driver's License Photograph of KIM and both positively identified him as

the subject in question. ▮▮▮▮ and ▮▮▮▮ had previously met KIM on a couple of occasions,

through ASLAM, and also communicated with KIM through telephone contact and email to and

from the TARGET ACCOUNT. For example, on or about May 9, 2012, ASLAM emailed

▮▮▮▮ as well as KIM at the TARGET ACCOUNT, stating, "Tae, ▮▮▮ is our CPA. He need

[sic] access to our Citibank accounts except AMNA Medical Care accounts. Can you please

help."

69.     Your Affiant learned from ▮▮▮▮ and ▮▮▮▮ that the first payment they discovered

to KIM was a $60,000.00 check on February 28, 2012, from a Northwest Savings Bank account.

▮▮▮▮ provided a copy of the check to the Affiant. An analysis of ASLAM's various accounts

demonstrated that an ASLAM-related entity, 300 E. Pulaski LLC, drew $3 million on an existing

loan. Thereafter, the first check written after the draw was the $60,000.00 check to KIM

referenced in paragraphs 27-29.

70.     In the summer of 2013, when ▮▮▮▮ was in the process of preparing the 2012 tax

returns for ASLAM's entities, ▮▮▮▮ asked ASLAM to explain the purpose of the $60,000 check

to KIM. ASLAM responded that the check was a loan to KIM but ASLAM never produced the

loan documents or repayment records, as requested by ▮▮▮.

71.     Your Affiant also received a copy from ▮▮▮▮ of a $39,510 check made out to

"Cash" and dated May 15, 2013. The check was from ASLAM's AMNA Medical Center, LLC,

account (account# *7737) at WSFS and had the following notation written next to it, "Out to

24

Tac." According to ▮▮▮, he was with ▮▮ employee ▮ ▮▮▮▮▮▮▮ when they asked ▮▮▮▮ to explain the purpose of the $39,510 check. [▮▮▮▮ previously worked at ▮▮ and was also involved in preparing the taxes for ASLAM's various entities.] ▮▮▮ told them that the $39,510 check was for KIM but gave no reason for the payment and provided no documents to justify why KIM received the funds.

72.    SA Lo Piccolo reviewed the QuickBooks account associated with AMNA Medical Center, LLC provided by ▮▮▮, which confirmed that ASLAM (at the time of ▮▮▮ s disengagement) had treated the $39,510 as an expense. Thus, there is no evidence within ASLAM's accounting records that the $39,510 payment was being treated as a loan contemporaneously.

### D.    The continuing business relationship between ASLAM and KIM

73.    During the week of August 17, 2015, your Affiant learned that ASLAM had purchased another medical practice called Delaware Physicians Associates, 4011 N. Market Street, Wilmington, DE. A check of New Castle County records showed that the building at 4011 N. Market Street was purchased by the 153DE Market, LLC on May 20, 2015. A check of the State of DE, Division of Corporation records showed that 153DE Market, LLC was formed on May 13, 2015. The registered members of 153DE Market, LLC are KIM and ▮▮▮▮ with the listed address of their residence in Wayne, PA. The sale price of the building was $700,000 and was mortgaged by Customer Bank in Phoenixville, PA.

74.    During the review of ASLAM's emails, your Affiant located the following emails on February 15, 2015, Subject: Signed Contract, between ASLAM and J▮▮▮▮ The emails concerned the contract to purchase the building (4011 N. Market Street, Wilmington, DE, 19802) where Delaware Physicians Associates is located. ASLAM purchased the practice in February

25

2015. In the first email in the chain, ▇▇ wrote the following to ASLAM:

> "Here is the signed contract. I noticed the buyer changed from 153 LLC to 153DE Market LLC-was that a typo? Also, ▇▇▇▇▇▇ and I wondered who is Tae Kim? Once they have signed, could you email me the contract with signatures? Thank-you."

> ASLAM then wrote the following response:

> "Tae is our partner in that building. Once he signed. I will forward you a signed copy. Thank you."

75. A few days later, on February 19, 2015, ▇▇ sent a follow-up email to ASLAM inquiring about the contract. ASLAM thereafter forwarded the email to KIM at the TARGET ACCOUNT with the subject "Signed Contract."

76. The subpoenaed loan file from Customers Bank showed that KIM and ▇▇▇▇ ▇▇▇▇▇▇ had taken out a $500,000 mortgage to purchase the building at 4011 N. Market Street, Wilmington, DE. Your Affiant has reviewed payments totaling $193,500 that were deposited into KIM's personal checking accounts at Wells Fargo Bank ("153 Management Co., LLC") and Customer's Bank ("153DEMarket, LLC") between May 2015 and February 2016.

77. In addition to being ASLAM's landlord for the Market Street location in Wilmington, there is evidence that KIM is also in business with ASLAM relating to a company named "1st Response Medical Transport" (hereinafter "1st Response"). For example, on May 16, 2014 – four days before WSFS finalized the three loans referenced in paragraphs 55-57 above – KIM sent an email from the TARGET ACCOUNT regarding ASLAM's recent purchase of 1st Response. The email, which KIM sent to an individual named ▇▇▇ stated the following:

Please reach out to ███ at First Response. Dr. Aslam just purchased First

Response. We will like for the two of you to work with each other to refer each

other business. First Response services a couple of nursing homes and we can

refer our nursing to them. . . . ███ I heard that you will be attending the upcoming

convention but that you do not have a booth. We have one for All-State labs and

want, you, First Response to be part of the booth. . . . ███████ and I will try to stop

by at the convention.

The email demonstrates that KIM and ASLAM had a business relationship that extended beyond

the GOS and the building on Market Street in Wilmington to at least a clinical laboratory and a

medical transport company.

78.    KIM and ASLAM have also communicated with frequency via their cellular

telephones. From in or around October 2015 through on or about April 9, 2016, KIM and

ASLAM exchanged in excess of 500 phone calls and 140 text messages.

### NEXUS TO KIM'S EMAIL ACCOUNT

79.    As set forth above, ASLAM and KIM have communicated via the TARGET

ACCOUNT including, but not limited to, with respect to the loans that KIM originated and

administered for ASLAM at Citibank and WSFS; their separate business relationship that existed

outside of the lending relationship; and the retroactive loan agreement they entered into in

response to the I.R.S. audit.

80.    ████████████████████████████████████████████

your Affiant located a total number of 652 emails sent between ASLAM and the TARGET

ACCOUNT during the time period of June 9, 2011, through November 9, 2015 (the date through

which the government received emails relating to the ASLAM account).

81.   In addition, since November 9, 2015, the United States has intermittently utilized

a pen register on ASLAM's email account. From that date to the present, there have been at least

16 additional emails sent between ASLAM and the TARGET ACCOUNT.

## BACKGROUND CONCERNING EMAIL

82.   In my training and experience, I have learned that Google, Inc. provides a variety

of on-line services, including electronic mail ("email") access, to the public. Google, Inc. allows

subscribers to obtain email accounts at the domain name gmail.com, like the email account listed

in Attachment A. Subscribers obtain an account by registering with Google, Inc. During the

registration process, Google, Inc. asks subscribers to provide basic personal information.

Therefore, the computers of Google, Inc. are likely to contain stored electronic communications

(including retrieved and un-retrieved email for Google, Inc. subscribers) and information

concerning subscribers and their use of Google, Inc. services, such as account access

information, email transaction information, and account application information. In my training

and experience, such information may constitute evidence of the crimes under investigation

because the information can be used to identify the account's user or users.

83.   In general, an email that is sent to a Google, Inc. subscriber is stored in the

subscriber's "mail box" on Google, Inc.'s servers until the subscriber deletes the email. If the

subscriber does not delete the message, the message can remain on Google, Inc.'s servers

indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google,

Inc.'s servers for a certain period of time.

84.   A Google, Inc. subscriber can also store with the provider files in addition to

emails, such as address books and contact or buddy lists and other files, on servers maintained

and/or owned by Google, Inc. In my training and experience, evidence of who was using an

email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

85.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

86.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

29

87. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

88. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either

30

inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

89.     Based on the forgoing, your Affiant respectfully requests that the Court issue the proposed warrant to search the TARGET ACCOUNT as identified in Attachment A and to seize the items specified in Attachment B. Because the warrant will be served on Google, Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

90.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from

31

prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates,

or otherwise seriously jeopardize the investigation.

Respectfully submitted,

David F. Bole
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____April  13_____, 2016

Honorable Mary Pat Thynge
CHIEF UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with email account taehkm1@gmail.com that is stored at premises controlled by Google, Inc., a company that accepts service of legal process at Google, Inc., 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Google, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

1

## II.  Information to be seized by the government *dating from June 1, 2010 to the present (DFS 04/13/16)*

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18 U.S.C §§ 215, 1001, 1014, 1344, 2, and 317, those violations involving TAE KIM and/or Dr. ZAHID ASLAM, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)  Evidence relating to the above offenses, including but not limited to the following:

1.  Evidence relating to the banking relationship between TAE KIM and Dr. ZAHID ASLAM at Citibank and WSFS Bank, including but not limited to communications regarding the origination and administration of commercial loans for ASLAM, his related entities, and for other individuals and entities on behalf of ASLAM and/or his related entities;

2.  Evidence relating to any gifts, loans or other payments (or requests for such) between ASLAM to KIM, including but not limited to payments via cash, check, a vehicle, or other goods or services;

3.  Evidence indicating the existence of any separate business relationship outside of the banking relationship between KIM and ASLAM;

4.  Evidence relating to the preparation, execution, and submission of loan documents relating to a $60,000 payment from ASLAM to KIM in response to an I.R.S. audit of ASLAM and his related entities.

(b)  Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

2

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to the conduct set forth above, including records that help reveal their whereabouts.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## BUSINESS RECORDS PURSUANT TO FEDERAL RULE
## OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct.  I am employed by Google, Inc., and my official

title is _____.  I am a custodian of records for Google, Inc.  I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Google, Inc., and that I am the custodian of the attached records

consisting of _____ (pages/CDs/kilobytes). I further state that:

a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

b.     such records were kept in the ordinary course of a regularly conducted business

activity of Google, Inc.; and

c.     such records were made by Google, Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.

_____          _____
Date                             Signature

4